## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

BATH & BODY WORKS BRAND
MANAGEMENT, INC.,

        Plaintiff,

v.

TRI-COASTAL DESIGN GROUP, INC.

        Defendant.

CIVIL ACTION
Index No.: 2:12-cv-00957-WJM-MF

TRI-COASTAL DESIGN GROUP, INC.

        Counterclaim Plaintiff,

v.

BATH & BODY WORKS BRAND
MANAGEMENT, INC.,

        Counterclaim Defendant.

## DEFENDANT'S MARKMAN BRIEF

Tedd S. Levine, Esq.
On the brief

## TABLE OF CONTENTS

|  | | Page |
|---|---|---|
| Table of Authorities | | i |
| Preliminary Statement | | 1 |
| Uncontroverted Facts | | 2 |
| Discussion | | 2 |
| I. | THE FUNCTIONAL ELEMENTS OF A DESIGN PATENT ARE NOT SUBJECT TO PROTECTION. | 2 |
| | A. Legal Standard | 2 |
| | B. The '415 Patent and the '532 Patent include design elements that were dictated by function | 4 |
| II. | PURSUANT TO RULE 702, PLAINTIFF'S WITNESS SHOULD BE DISQUALIFIED DUE TO HIS LACK OF REQUISITE EXPERIENCE AND KNOWLEDGE AND HIS TESTIMONY BEING BASED ON INSUFFICIENT FACTS AND DATA. | 14 |
| Conclusion | | 18 |

**TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page**

*Amazon.com v. Barnesandnoble.com,*
239 F.3d 1343 (Fed.Cir.2001) ...................................................................................... 3

*Amorgianos v. Nat'l R.R. Passenger Corp.*
303 F.3d 256 (2d Cir.2002) ......................................................................................... 15

*Application of Carletti,*
328 F.2d 1020, 1022, 140 U.S.P.Q. (BNA) 653 (1964) ............................................. 9

*Avia Group Int'l Inc. v. L.A. Gear California Inc.,*
853 F.2d 1557 (Fed.Cir.1988) ..................................................................................... 4, 5

*Best Lock Corp. v. Ilco Unican Corp.,*
94 F.3d 1563 (Fed. Cir. 1996) ..................................................................................... 6

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) ..................................................................................................... 14, 15

*Fuji Kogyo Co. v. Pacific Bay Int'l, Inc.,*
461 F.3d 675 (6th Cir.2006) ........................................................................................ 4

*G.B. Lewis Co. v. Gould Products, Inc.,*
297 F. Supp. 690, 696 (E.D.N.Y. 1968), aff'd, 436 F.2d 1176 (2d Cir. 1971) ......... 4

*Gen. Elec. v. Joiner,*
522 U.S. 136 (1997) ..................................................................................................... 15

*Glaxo Grp. Ltd. v. Ranbaxy Pharms., Inc.,*
262 F.3d 1333 (Fed.Cir.2001) ..................................................................................... 3

*Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.,*
162 F.3d 1113 (Fed. Cir. 1998) ................................................................................... 5

*Kahn v. Gen. Motors Corp.,*
135 F.3d 1472 (Fed.Cir.1998) ..................................................................................... 3

*Kumho Tire Co. v. Carmichael,*
119 S.Ct.1167, 1175 (1999) ......................................................................................... 16

*Lee v. Dayton–Hudson Corp.,*
838 F.2d 1186 (Fed.Cir.1988) ..................................................................................... 3, 9

|  | Page |
|---|---|
| *Markman v. Westview Instruments, Inc.,*<br>52 F.3d 967 (Fed.Cir.1995) *aff'd,* 517 U.S. 370 (1996) | 3, 5 |
| *OddzOn Prods., Inc. v. Just Toys, Inc.,*<br>122 F.3d 1396 (Fed.Cir.1997) | 3 |
| *Payless Shoesource, Inc. v. Reebok Intern. Ltd.,*<br>998 F.2d 985, (Fed. Cir. 1993) | 5 |
| *Pitney Bowes, Inc. v. Hewlett–Packard Co.,*<br>182 F.3d 1298 (Fed.Cir.1999) | 3 |
| *Power Controls Corp. v. Hybrinetics, Inc.,*<br>806 F.2d 234 (Fed. Cir. 1986) | 9 |
| *Richardson v. Stanley Works, Inc.,*<br>597 F.3d 1288 (Fed.Cir.2010) | 3 |
| *Rosco, Inc. v. Mirror Lite Co.,*<br>304 F.3d 1373, 1378 (Fed. Cir. 2002) | 4 |
| *Seiko Epson Corp. v. Nu-Kote Intern.,* Inc.,<br>190 F.3d 1360 (Fed. Cir. 1999) | 5 |
| *Sundance, Inc. v. Demonte Fabricating Ltd.,*<br>550 F.3d 1356 (Fed.Cir.2008) | 15 |
| *Telebrands Direct Response Corp. v. Ovation Communications, Inc.,*<br>802 F.Supp. 1169 (D.N.J.,1992) | 4 |
| *Tyco Industries, Inc. v. Tiny Love, Ltd.,*<br>914 F.Supp. 1068 (D.N.J.,1996) | 4 |
| *Uniloc USA, Inc. v. Microsoft Corp.,*<br>632 F.3d 1292 (Fed.Cir.2011) | 15 |
| *W.R. Grace & Co., Inc. v. Western U.S. Industries Co.,*<br>187 U.S.P.Q. 40 (C.D. Calif. 1976) | 4 |
| *W.Y. Industries, Inc. v. Kari-Out Club LLC,*<br>Not Reported in F.Supp.2d, 2011 WL 3841106 (D.N.J.,2011) | 4, 6 |

**Statutes**

Fed. R.Evid. 702, 28 U.S.C.A.                                      14, 15, 16

35 U.S.C.A. § 171                                                 4

## PRELIMINARY STATEMENT

This action concerns claims for infringement of two patents, namely US Design Patent No. D615,415 (the "'415 Patent") and US Design Patent No. D623,532 (the "'532 Patent") (jointly, the "Patents"). The Patents relate to bottle designs. Notwithstanding that the exact bottles being used by defendant that plaintiff accuses of infringing the Patents have been available to consumers in the United States more than three years before plaintiff filed its patent applications and that proof of which in the form of affidavits, purchase orders, invoices, and photographs were provided to plaintiff, several key design elements of the bottles are dictated by function. Defendant's expert, who spent virtually his entire career designing bottles and containers, and is the identified inventor on 37 bottle patents, identified in his report a number of features of the bottles at issue that are driven by function.

To rebut such contention, plaintiff produced a witness who is purportedly an "expert" in such matters but who admittedly never created a bottle, has no education designing bottles, never invented a bottle design, nor was he involved in the manufacturing process of bottles. In fact, plaintiff's witness admits his sole background concerning bottles is that he "collects them" as a hobby. If that isn't bad enough, his sole analytical review of the Patents involved having two children and one adult randomly grab the '415 Patent bottle to prove the grips and the hourglass shape are *not* dictated by function.

Plaintiff suggests it is wholly outside the determination of claim construction to consider plaintiff's commercial exploitation of the patent designs. Plaintiff argues that the bottles could have been constructed of various materials and used with a multitude of products so analyses of the actual bottles sold by plaintiff is inappropriate. Plaintiff further argues that the bottles should be considered as a whole and it is improper to separately identify and exclude the functional

1

elements. Finally, plaintiff and its witness reason that in the context of a design patent if every user does not need a feature such feature is considered ornamental. Defendant disagrees.

Extrinsic evidence serves to educate and guide the Court to a better understanding of the purpose of various design elements. When designing the bottle, plaintiff's core intention to use a plastic material and/or a pump in connection with slippery bath products is relevant when considering the primary purpose for the particular design element at issue. Finally, it is inapposite to suggest there is a requirement that every consumer needs to use a feature for the feature to be functional since such a rule of law would negate many utility patents and would ultimately eliminate the need for a claim construction hearing with regard to design patents.

These matters are discussed more fully below.

### UNCONTROVERTED FACTS

The application for US Design Patent No. D615,415 (the "'415 Patent") was filed on September 5, 2008 and the patent issued on May 11, 2010 (*see* Levine Dec. Ex. A).

The application for US Design Patent No. D623,532 (the "'532 Patent") was filed on September 17, 2009 and the patent issued on September 14, 2010 (*see* Levine Dec. Ex. B).

### DISCUSSION

## I. THE FUNCTIONAL ELEMENTS OF A DESIGN PATENT ARE NOT SUBJECT TO PROTECTION.

### A. Legal Standard

Infringement analysis involves two steps: the court first construes the scope of the asserted claims and then compares the accused device to the properly construed claims to determine whether each and every limitation of a claim is present, either literally or equivalently,

2

in the accused device. *Amazon.com v. Barnesandnoble.com,* 239 F.3d 1343, 1351 (Fed. Cir 2001); *Kahn v. Gen. Motors Corp.,* 135 F.3d 1472, 1476, 1478, 45 USPQ2d 1608, 1610 and 1612 (Fed.Cir.1998). Claim construction is an issue of law, reviewed *de novo. Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979–81, 34 USPQ2d 1321, 1328–29 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Comparing the accused product to the asserted claims is a question of fact that is reviewed with substantial deference. *Glaxo Grp. Ltd. v. Ranbaxy Pharms., Inc.,* 262 F.3d 1333, 1335, 59 USPQ2d 1950, 1952 (Fed.Cir.2001).

In a design patent, protection is limited to the ornamental features of an article. *Lee v. Dayton–Hudson Corp.,* 838 F.2d 1186, 1188 (Fed.Cir.1988). As a result, in *OddzOn Prods., Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1405 (Fed.Cir.1997), the court held that "[w]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the nonfunctional aspects of the design as shown in the patent." *See also Richardson v. Stanley Works, Inc.,* 597 F.3d 1288, 1293 (Fed.Cir.2010) (stating that the district court properly factored out the functional features of the plaintiff's design as part of its claim construction).

The Federal Circuit has held that "it is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field," *Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1309 (Fed.Cir.1999). "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."). Although, a court may use extrinsic evidence "for background and education on the

3

technology implicated by the presented claim construction issues," it cannot rely on it to arrive at a claim construction. See *W.Y. Industries, Inc. v. Kari-Out Club LLC*, Not Reported in F.Supp.2d, 2011 WL 3841106 (D.N.J.,2011).

Where patented design is composed of functional as well as ornamental features, to prove infringement, owner must establish that ordinary person would be Dec.eived by reason of common features in claimed and accused designs that are ornamental; in addition, accused design must appropriate novel ornamental features of patented design that distinguish it from prior art. See *Tyco Industries, Inc. v. Tiny Love, Ltd.*, 914 F.Supp. 1068 (D.N.J.,1996). Infringement of design patents do not occur where the similarities cited are of a functional nature. See *Telebrands Direct Response Corp. v. Ovation Communications, Inc.*, 802 F.Supp. 1169 (D.N.J.,1992) citing *G.B. Lewis Co. v. Gould Products, Inc.*, 297 F. Supp. 690, 696 (E.D.N.Y. 1968), aff'd, 436 F.2d 1176 (2d Cir. 1971); *W.R. Grace & Co., Inc. v. Western U.S. Industries Co.*, 187 U.S.P.Q. 40, 46 (C.D. Calif. 1976).

B.  **The '415 Patent and the '532 Patent include design elements that were dictated by function.**

The general rule is that when there are several ways to achieve the same functions or utilitarian purpose as that achieved by a design patent, then it is more likely that the specific design claimed in the patent serves a primarily ornamental purpose and is thus valid. See, e.g., *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1378 (Fed. Cir. 2002); 35 U.S.C.A. § 171. The level of functionality necessary to invalidate a design patent is only established "[w]hen function dictates design." *Avia Group Int'l Inc. v. L.A. Gear California Inc.*, 853 F.2d 1557, 1563 (Fed.Cir.1988). "[I]f the particular design is essential to the use of the article, it can not be the subject of a design patent". *Fuji Kogyo Co. v. Pacific Bay Int'l, Inc.*, 461 F.3d 675, 683 (6th

Cir.2006).    Thus, a design patent will be upheld so long as a court agrees with the Patent &
Trademark Office that the product was not designed to serve primarily functional purposes.

In construing design patents, courts consider the patent's claims, the specification, and the
prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d at 979.  Courts may also
consider "expert testimony, including evidence of how those skilled in the art would interpret the
claims," as well as other extrinsic evidence. *Id.* As design patents typically are claimed as shown
in drawings, without any written description, the court's claim construction must be adapted
accordingly. See *Goodyear Tire & Rubber Co v. Hercules Tire & Rubber Co., Inc.,* 162 F.3d
1113, 1116 (citing 37 C.F.R. § 1.153(a)); 37 C.F.R. § 1.153(a).

Plaintiff argues that the Court should not look past the design patent drawings to the
actual article produced from those drawing to determine the principal purpose for the design.
Plaintiff suggests the Court is confined to the four corners of the patent to determine
functionality and that the material actually used by the patent holder to produce a product using
the patent design is irrelevant.  To that end, Plaintiff appears to be relying upon the basic premise
that in determining whether the accused design infringes the design patent, the accused design
must be compared to the claimed design, not to the commercial embodiment of the patent. See
*Payless Shoesource, Inc. v. Reebok Intern. Ltd.,* 998 F.2d 985, 990–91, 27 U.S.P.Q.2d (BNA)
151 6 (Fed. Cir. 1993).   Nonetheless, contrary to plaintiff's contention, it is not only proper to
analyze plaintiff's products that result from the design patent but such a review is often
necessary. A design is functional when it is "dictated by" the use or purpose of the article of
manufacture in which it is embodied. *Seiko Epson Corp. v. Nu-Kote Intern.*, Inc., 190 F.3d 1360,
1368, 52 U.S.P.Q.2d (BNA) 1011 (Fed. Cir. 1999); *Avia Group Intern., Inc. v. L.A. Gear
California, Inc.*, 853 F.2d 1557, 1563, 7 U.S.P.Q.2d (BNA) 1548 (Fed. Cir. 1988). A design that

is essential to the operation or use of an article, therefore, cannot be the subject of a valid design patent. *Best Lock Corp. v. Ilco Unican Corp.*, 94 F.3d 1563, 1566, 40 U.S.P.Q.2d (BNA) 1048 (Fed. Cir. 1996).   Since a drawing may obscure or otherwise fail to communicate the purpose of the design, the best extrinsic evidence to determine whether a design feature is motivated by function tends to be the actual product that the patent holder produced using such design. Using such extrinsic evidence will clarify for the Court what the patent teaches.

The above being said, the design features of the '415 Patent that are dictated by function are as follows:

(i)      *The concave bottom.*



FIG. 7

The patent shows a design element of what appears to be a concave bottom but the drawings clearly don't teach anything about it or otherwise convey a purpose.  For that reason, the introduction of extrinsic evidence for background and education purposes is essential. See *W.Y. Industries, Inc. v. Kari-Out Club LLC, supra.*  To that end, defendant's expert Robert J. McHenry ("McHenry"), based upon his background of more than twenty years creating and

6

engineering bottles, explains this design feature is required as a result of the blow molding manufacturing process so as to prevent the bottle from wobbling. (See Levine Dec. Ex. C, McHenry Expert Rep., pp. 2-3; see also Levine Dec. Ex. D, McHenry Transcript, pp.20:15-26:10.) McHenry makes clear, as a result of the blow molding process that plaintiff's designer knew would be employed to manufacture the bottle, since that is the only feasible method that could be used to manufacture the bottle[1], a concave bottom is necessary to recess the "sprue" that will hang off the bottom as a result of such process.

      (ii)    *The side grips or ridges.*



---

[1] McHenry testified that injection molding is the other method for making bottles but is not a workable alternative with regard to the bottle pictured in the '415 Patent. (See Levine Dec. Ex. D, McHenry Transcript, pp.22:13-23-7).

While Plaintiff self-servingly labels the grips or ridges as Decorative "flutes" to negate their purpose, the side grips, which run from the start of the curvature (or the hourglass shape) to the bottom of the curvature, are plainly intended to facilitate holding the bottle. A physical examination of plaintiff's bottle and the literature referred to in McHenry's expert report confirms the design elements on the side of the bottle are functional grips or ridges. (*See* Levine Dec. Ex. C, McHenry Expert Rep., p. 3; Levine Dec. Ex. D, McHenry Transcript, pp.13:7-15:17.) As stated in the article cited by McHenry, "[r]idges are often added to surfaces to improve grip of objects". Regardless of plaintiff's contention that the ridges are ornamental because the length and/or direction can vary, the ridges are motivated by function, i.e., they are included to help the user grasp the bottle so it doesn't slip.

(iii)     *The rounded top and bottom shoulders.*



8

The blow molding manufacturing process drives the rounded features of the bottle. As stated by McHenry in his report, and confirmed by him under oath, "rounded top and bottom shoulders provide improved mechanical performance both directly because of the structural behavior of round structures and because they would result in more uniform material distribution in the blow molding process. Round structures are well known to provide improved resistance to compressive and bending loads compared to structures having sharp corners . . . Such compressive and bending loads are generated on most bottles during the capping process and on bottle[s] used for pump dispensing because of the vertical force applied by the consumer during pumping." (*See* Levine Dec. Ex. C, McHenry Expert Rep., p. 3.)

Plaintiff would like the Court to ignore these recognized vital performance benefits of rounded features on a bottle and accept that the design was not dictated by function but motivated entirely by its ornamental appeal. It should be noted that many well-constructed articles of manufacture whose configurations are dictated by function are pleasing to look upon, for example a hexnut, a ball bearing, a golf club, or a fishing rod, the pleasure depending largely on one's interests. But it has long been settled that when a configuration is the result of functional considerations, the resulting design is not patentable as an ornamental design for the simple reason that it was not created for the purpose of ornamenting. See *Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1188, 5 U.S.P.Q.2d (BNA) 1625 (Fed. Cir. 1988); *Power Controls Corp. v. Hybrinetics, Inc.*, 806 F.2d 234, 238–40, 231 U.S.P.Q. (BNA) 774 (Fed. Cir. 1986); *Application of Carletti*, 51 C.C.P.A. 1094, 328 F.2d 1020, 1022, 140 U.S.P.Q. (BNA) 653 (1964).

9

(iv)    *The hourglass or silhouette shape.*



FIG. 2

This shape is aimed at securely grasping a slippery bottle. As noted by McHenry, this feature provides "significant functional advantages" and is "particularly valuable for a shower or bath gel because the consumer's hand will be partially covered with the product or a mixture of the product and water making the bottle more slippery". (*See* Levine Dec. Ex. C, McHenry Expert Rep., p. 2.) "[F]or a bottle without the hourglass feature, the consumer would have to squeeze the bottle with an appreciable normal force sufficient to generate a vertical frictional force equal to or greater than the gravitational force acting on the bottle. For a bottle with an hourglass shape, a smaller grasping force is required because the bottle would have to push the fingers apart in order to move downwardly." *Id*

10

The design features of the '532 Patent that are dictated by function are as follows:

(i)     *The concave bottom.*



Consistent with the '415 Patent (see discussion above), a design element of what appears to be a concave bottom is shown in the drawings of the '532 Patent which is required as a result of the blow molding manufacturing process so as to prevent the bottle from wobbling. (*See* Levine Dec. Ex. C, McHenry Expert Rep., pp. 3-4; *see also* McHenry Transcript, pp.20:15-26:10.) McHenry explains, as a result of the blow molding process, which is the only feasible method that could be used to manufacture the bottle, a concave bottom is necessary to recess the "sprue" that will hang off the bottom.  Recessing the bottom permits the bottle to sit flatly.

(ii)    *The trapezoid shape located directly below the cap.*



11

McHenry explains that the smaller trapezoid located directly below the cap is dictated by three functional advantages (compared to, say, a flat top). (*See* Levine Dec. Ex. C, McHenry Expert Rep., pp. 5-6):

1. "One advantage is that it provides greater vertical crush resistance through providing a transitional path for the loads from a pumping force exerted on the cap to the bottle sidewall. With a flat top rather than a trapezoid, the loads would be concentrated in the center of the flat top, creating high bending loads in the top. With the trapezoid, the loads are spread out to the edges of the sidewall." *Id.*

2. "This trapezoid has a further advantage . . . of allowing the consumer to position her hands closer to the tip of the spout. Because the angle of this trapezoid is greater in the longer dimensions, this advantage will be greater when the spout happens to be in a rotational position above the longer diagonal of the parallelogram." *Id.*

3. "The third functional advantage of this trapezoid is that in lowering the corner of the main trapezoid, it will reduce the thinning that would otherwise occur in the corners along the long diagonal of the parallelogram."

While it is acknowledged that there are multiple ways to design a bottle, this particular feature is dictated by function, namely improving crush resistance, enhancing hand positioning, and reducing thinning.   Since it is difficult if not virtually impossible to understand from the drawings that comprise the '532 Patent what is being communicated, reviewing plaintiff's commercial expression of the patent helps educate the Court on what this patent actually teaches.

(iii)     *The trapezoid shape located at the bottom of the bottle.*



Likewise, this design feature is dictated by function.  More specifically, "[w]ith respect to the short inverted trapezoid near the bottom of the bottle (and the blending curve connecting this trapezoid to the main trapezoid), it acts much as the bottom shoulders of '415 Patent in avoiding excessive thinning in the corners.  It is even more important with this bottle because of the distance that the plastic travels from the preform to the corners at the long diagonal of the parallelogram."  (*See* Levine Dec. Ex. C, McHenry Expert Rep., p. 6.)

(iv)     *The overall trapezoid shape of the bottle.*



13

The overall trapezoid design was dictated by improved stability and to facilitate squeezing the bottle. "The main trapezoidal shape feature provides improved vertical stability or resistance to tipping over when the bottle is subjected to a horizontal force in a plane above the base. Such a horizontal force component can easily occur with bottles having a pump dispenser . . . . If the consumer does not exert the pumping action in an exactly vertical direction, there will be a horizontal force component in addition to the desired vertical force component. The trapezoidal shaped bottle will have a significantly lower center of gravity. The "critical tipping point" for a container occurs when the bottle is gradually tipped until the center of gravity is vertically above the side of the base about which the rotation is occurring." (*See* Levine Dec. Ex. C, McHenry Expert Rep., pp. 4-5.)

The parallelogram shown on the patent drawing has a 115 degree angle at two corners of the cross section of the bottle and a 65 degree angle at the other two corners; whereas, a rectangular cross section parallelogram has ninety degree angles at all four corners . . . There is . . . a functional advantage of this cross section for a bottle in which the product is dispensed by gently squeezing the bottle. *Id.*

II.   **PURSUANT TO RULE 702, PLAINTIFF'S WITNESS SHOULD BE DISQUALIFIED DUE TO HIS LACK OF REQUISITE EXPERIENCE AND KNOWLEDGE AND HIS TESTIMONY BEING BASED ON INSUFFICIENT FACTS AND DATA.**

Prior to admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v.*

14

*Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Under *Daubert,* it is the trial court's duty to ensure that all expert testimony comports with Rule 702 and is both reliable and relevant. *Id.* at 589. Thus, the court functions as a gatekeeper and must exclude evidence that is either irrelevant or unreliable. *See Sundance, Inc. v. Demonte Fabricating Ltd.,* 550 F.3d 1356, 1360 (Fed.Cir.2008). In the patent context, if the patent holder fails to tie the expert's theory to the facts of the case, the expert's testimony must be excluded. *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1315 (Fed.Cir.2011).

When an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702[2] mandate the exclusion of that unreliable opinion testimony. *See Amorgianos v. Nat'l R.R. Passenger Corp.* 303 F.3d 256, 266 (2d Cir.2002). Expert testimony is inadmissible if only "connected to existing data by the ipse dixit of the expert." *Gen. Elec. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The *Daubert* factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and, (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. *See Daubert,* 509 U.S. at 592

---

[2] Federal Rule of Evidence 702, 28 U.S.C.A, entitled "Testimony by Expert Witnesses", provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

95.    Another factor relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact includes whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See Kumho Tire Co. v. Carmichael*, 119 S.Ct.1167, 1175 (1999).

According to plaintiff's purported *expert* witness, Robert Anders ("Anders"), his sole analytical review of the bottles was to observe three people grab the bottle that commercially embodies the '415 Patent. (*See* Levine Dec. Ex E, Anders Expert Report p. 14, ¶43; and Levine Dec. Ex F, Anders Transcript, p.28:6-15.) Anders testified as follows:

> Q. You discuss that you . . . did some kind of an empirical study with three people grabbing the bottle.
> A. Correct
> Q. Did you make any other tests?
> A. I'm sorry?
> Q. Did you perform any other tests with regard to the bottle?
> A. No. Those were the only test that I did.

It is axiomatic that any conclusion reached by Anders with regard to three people being observed grabbing a bottle is not based on sufficient facts or data and his opinion is the product of unreliable principles and methods. *See* Fed. R. Evid. 702, 28 U.S.C.A. In fact, since the drawings in the Patents tend for the most part to obscure what the patents teach, Ander's failure to review any extrinsic evidence other than unrelated bottles and patents[3] that have no relevance to this case causes his opinion to be woefully lacking.

With regard to Anders' lack of requisite knowledge to express reliable opinions regarding what portions of the bottle designs of the '415 Patent and the '532 Patent are dictated by

---

[3] To demonstrate just how deficient Anders' view is, he actually looks to the design of a Coca Cola® bottle to demonstrate that the concave bottom of the '415 Patent and '532 Patent are not functional since the bottom of bottles can be designed differently to address the protruding sprue. Respectfully, what Anders fails to understand, likely because he has no experience designing or manufacturing bottles, is that the claw feet of the coke bottle is functionally designed to address the pressure the bottle needs to withstand which a concave bottom design can't achieve. (*See* Levine Dec. Ex E, Anders Expert Report pp. 20-21, ¶¶62-63.)

function, Anders testified as follows:

> Q. Now, as part of your background, have you ever designed any bottles that went into commercial use?
>
> A. I taught bottle design for a class that was funded by Colgate-Palmolive, and it was for a bottle to be used for a detergent, laundry detergent.
>
> Q. Did that bottle end up in commercial use?
>
> A. No, I don't think so.
>
> Q. Any other experience with bottle design other than teaching a course?
>
> A. I mean, I've collected bottles and I've studies bottle design. I have a collection of a couple hundred bottles, the earliest of which are from the second century. As an undergraduate, I had created a bottle design for a perfume bottle that was to be made out of glass.
>
> Q. Did that end up in commercial use?
>
> A. No.
>
> Q. Are you the inventor on any patents?
>
> A. No.
>
> Q. Did you participate in any inventions in which you're not listed as the inventor?
>
> A. No. I have of course invented a number of things, but of course chose not to have any protection.
>
> Q. Do you have any experience in creating plastic bottles other than what you just testified to?
>
> A. No, although I had designed some packages and some containers when I was at Bristol-Myers.
>
> Q. What kind of packages?
>
> A. Packages for a wide variety of health & beauty aids. The package that I designed for the corporate gift box was entered by members of the packaging committee and was awarded first prize in a national competition.

In a nutshell, Anders acknowledges that he bases his opinion on the premise that in the context of a design patent, if the feature is not necessary or needed by every user, then it would be considered to be ornamental and not functional. (*See* Levine Dec. Ex F, Anders Transcript, p.76:2-9.) Nonetheless, there is no authority that supports such a rigid view.

It is evident that Anders background is distressingly deficient to challenge McHenry or otherwise form a meaningful opinion as to what features of a bottle design are dictated by function. He is certainly not an expert in bottle design or bottle manufacturing.

17

## CONCLUSION

For more than twenty years McHenry has been intimately involved with the design, development, production and sale of bottles. Because of the large amount of expense involved in developing bottles and the processes and apparatuses for forming them, McHenry and his employers routinely sought to protect the intellectual property developed by filing and pursuing multiple patent applications. In every case, the objective of the development was to obtain improved functional performance and economics compared to the prior art and compared to other bottles in the market place. Since the plastic container and bottle market is technically demanding and very competitive, these performance and economic improvements were the driving motivation for McHenry's inventions. Accordingly, McHenry and his employer filed for and secured utility patents. (*See* Levine Dec. Ex. C, McHenry Expert Rep., pp. 12-13.)

The types of functional improvements developed by McHenry and his employers that are protected by utility patents are similar to the functional improvements that McHenry describes in his expert report with regard to the '415 Patent and the '532 Patent. In that report, McHenry explains functional improvements relating to the '415 Patent and the '532 Patent such as reducing dropping and tipping, properties that are of significant importance in the bath & body industry.   In fact, many of McHenry's 37 utility patents protect similar features.    Hence, assuming novelty and lack of obviousness, *inter* alia, it appears that utility patents would have issued for the bottles covered by the '415 Patent and the '532 Patent supporting the inappropriateness of plaintiff obtaining protection of the described improved functional advantages through design patents.

18

Dated: Garden City, New York
      January 31, 2013

Respectfully Submitted by,

LAW OFFICES OF TEDD S. LEVINE, LLC
Attorneys for Plaintiff

By:_____
     Tedd S. Levine, Esq. (TL 0158)
     1305 Franklin Avenue, Suite 300
     Garden City, NY 11530
     Tel: (516) 294-6852
     Fax: (516) 294-4860
     lawofficesofteddslevine@gmail.com